Willard E. BARTEL and David C. Pee-
bles, Administrators of the Estate of
Rolf L. Lindstrom, Plaintiffs,

v.

JOHN CRANE, INC., Defendant.

No. 1:98CV13222.

United States District Court,
N.D. Ohio.

May 3, 2004.

Donald A. Krispin, Jaques Admiralty, Detroit, MI, Robert E. Swickle, The Maritime Asbestosis Legal Clinic, Duane C. Marsden, Jaques Admiralty Law Firm, Detroit, MI, Roger B. Lane, Lane & Gossett, Brunswick, GA, for Plaintiffs.

Stephen H. Daniels, Evan J. Palik, McMahon, DeGulis, Hoffmann & Lombard, LLP, Cleveland, Ohio, Mark I. Tivin, O'Connell & Associates, Elgin, IL, for Defendant John Crane, Inc.

## POST TRIAL FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT

POLSTER, District Judge.

### Factual and Procedural Background

Plaintiff Rolf Lindstrom ("Lindstrom") sailed as a merchant seaman from July,

1964 until December, 1994 aboard numerous vessels. He worked primarily in the engine department in various crew positions, including Fireman/Watertender, Chief, and First, Second and Third Engineer. During his years as a seaman, Lindstrom alleges that he worked with numerous pieces of equipment which exposed him to asbestos and asbestos-containing products.

On April 9, 1998, Plaintiff brought claims for negligence under the Jones Act, 46 U.S.C. §§ 688, *et seq.*, the General Admiralty and Maritime law, and traditional product liability law. *ECF No. 1.* Lindstrom claims that he contracted this disease as a result of his work-life exposures to asbestos and asbestos-containing products while aboard various steam vessels. Lindstrom claims that Defendant John Crane ("John Crane") was one of the manufacturers and/or suppliers of asbestos-containing products on the vessels on which he served, and that Lindstrom's exposure to John Crane products was a substantial factor in causing his peritoneal mesothelioma.[1] On May 7, 2003, John Crane filed a brief in support of its Motion for Summary Judgment. *ECF No. 173.* On May 19, 2003, the Court denied John Crane's motion for summary judgment. *ECF No. 188.*

On June 15, 2003, Lindstrom died from complications of peritoneal mesothelioma, a form of cancer of the peritoneal mesothelial membrane in the abdomen. Willard E. Bartel, Esq. and David C. Peebles, Esq. were appointed administrators of the estate of Rolf L. Lindstrom and substituted as the Plaintiffs. The original complaint was amended to include wrongful death and survival claims. *ECF No. 229.* John Crane was the only remaining defendant.

The Court granted summary judgment to several defendants and the remainder were dismissed pursuant to settlement or dismissed voluntarily by the Plaintiff.

Both parties consented to the case being tried by the Court. *Trial Transcript,* Volume 1 at page 11, line 17. The trial of this matter commenced on Wednesday, February 18, 2004 and courtroom proceedings concluded on Friday, February 27, 2004. By agreement of the parties, Dr. Yasunosuke Suzuki's rebuttal testimony was taken by means of videotaped deposition in New York City on March 5, 2004, and the videotape and transcript were admitted as part of the trial record.

### Introduction and Summary

This case is unusual since almost all the substantive testimony was from expert witnesses. I must therefore decide the case in the same manner as a jury would have decided it: which experts are more persuasive, in terms of the content of their testimony, the basis for their conclusions, the methodologies they used, the acceptance of their methodologies by the scientific community, the tests they performed, and their general credibility (credentials, thoroughness, demeanor, bias towards plaintiffs or defendants in asbestos litigation).

I have concluded that Plaintiff has not met his burden of proving that John Crane's gaskets or packing was a "substantial factor" [product liability theory of liability] or a "proximate cause" [negligence theory] in Lindstrom's peritoneal mesothelioma. Under either theory, Plaintiff needed to produce persuasive evidence that more than background levels (ambient air levels) of asbestos was released into the air when Lindstrom was

---

1. The case was assigned to an MDL Panel, and then was transferred back to this District in January, 2003.

working on John Crane packing and gaskets.

It is not sufficient to assert, as did Plaintiff's expert Dr. Frank, that even one asbestos fiber that got into Lindstrom's lungs could have caused his mesothelioma, and that there is, therefore, no medically safe level of asbestos exposure. This is a strict liability standard, which the law does not impose upon manufacturers of products containing asbestos. This argument would completely obviate the "substantial factor" and the "proximate cause" standards, which Sixth Circuit case law directs me to apply.

Defendant John Crane called three witnesses who performed specific fiber release studies of John Crane packing and gaskets over a 20–year period. All three testified that their tests showed that insignificant amounts of asbestos were released into the air. While Plaintiff could point out problems with each of these experts, their testimony was essentially unrebutted. The only witness called by Plaintiff who performed tests on John Crane products was Dr. Millette, and he pointedly did not attempt to measure or quantify the asbestos fibers released into the air when John Crane products were cut.

While the parties stipulated that Lindstrom had peritoneal mesothelioma, and Plaintiff established that Lindstrom's disease was probably caused by prolonged exposure to asbestos, Plaintiff has not met his burden of proving substantial factor or proximate cause, for the following reasons:

a. Lindstrom was exposed to lots of other asbestos-containing material on board ship during his 30–year career, much of which was highly friable and which contained amphibole fibers;

b. John Crane gaskets and packing contained only chrysotile asbestos. While there is debate in the medical community over whether chrysotile asbestos is carcinogenic, it is generally accepted that it takes a far greater exposure to chrysotile fibers than to amphibole fibers to cause mesothelioma. It takes an even greater exposure (ten times) to asbestos to cause peritoneal mesothelioma versus pleural mesothelioma;

c. The chrysotile asbestos in John Crane packing and gaskets was at least partially, if not completely, encapsulated;

d. The prevailing view is that only fibers greater than 5 microns in length cause cancer;

e. All of the above factors corroborate the testimony of the three John Crane experts who performed air release tests that John Crane packing and gaskets do not release dangerous quantities of asbestos fibers (more than background levels).

### FINDINGS OF FACT

Lindstrom was a career merchant mariner. *Trial Transcript*, Plaintiff's Exhibit 147, *Rolf L. Lindstrom Deposition Transcript* ("Lindstrom Depo."), at 13. He sailed as a merchant seaman from July, 1964 until December, 1994 aboard numerous vessels. *Lindstrom Depo.* at 13. He worked primarily in the engine department in various crew positions. He began his career as an unlicensed Fireman/Water-tender, and then worked his way up to Third, Second, First, and Chief Engineer. *Lindstrom Depo.* at 13–14. He stopped sailing in December, 1994 and officially retired in July, 1995. *Lindstrom Depo.* at 76. There were no health reasons for his retirement. *Id.* Lindstrom did not work from the time of his retirement in 1994 until his death in 2003. *Lindstrom Depo.* at 79.

In 1999, Lindstrom was diagnosed with peritoneal mesothelioma. *Lindstrom Depo.* at 8. He passed away in June, 2003

as a result of this disease. *Linda Lindstrom's Trial Testimony* at 66.

During the years Lindstrom sailed, a wide variety of asbestos-containing products were available and used aboard ships in many applications. *Lindstrom Depo.* at 28–29; 34; 38–39; 41–44; 53–57. There were significant differences among these products, including, among other things, the intended use of the product; the manner in which the product was manufactured; the propensity of the product to release fibers; the type of asbestos fiber used in the product; and the ability of the product to cause disease.

Many of the asbestos-containing products to which Lindstrom was exposed were "friable." Friable means capable of being turned to dust under hand pressure. *Henry Buccigross' Trial Testimony* ("Buccigross") at 269. Friable asbestos containing products include pipe insulation, boiler insulation, blankets, block and wallboard. *Buccigross* at 288–290. Lindstrom also used "encapsulated" asbestos containing products. Encapsulated products are manufactured in a manner which envelops the asbestos fibers with a binder that prevents the fibers from being released into the air when the product is being handled or used. *Buccigross* at 270. Encapsulated products include gaskets and valve packing. *Id.* at 271–272; 287–288.

John Crane manufactured both asbestos containing and non-asbestos containing gaskets and packing. The asbestos containing gaskets and packing manufactured by John Crane were all at least partially encapsulated. *Buccigross* at 287–288.

Another significant difference among the various types of asbestos-containing products is the type of asbestos fiber used in the product. Asbestos fibers are classified into two groups. The first category is the amphiboles. There are two main commercial types of amphibole asbestos: amosite and crocidolite. *Dr. Samuel P. Hammar's Trial Testimony* ("Hammar") at 17; *Dr. Richard Lemen's Trial Testimony* ("Lemen") at 32. The amphiboles are long, straight, spear-like and relatively hard. *Dr. James Crapo's Trial Testimony* ("Crapo") at 27. Amosite and crocidolite are iron silicates, very stable, and resist degradation. *Crapo* at 24.

The second category of asbestos fibers is the serpentine fiber, of which chrysotile is the only member. *Lemen* at 32. The chrysotile asbestos fiber is s-shaped or serpentine, relatively soft, and is composed of magnesium silicate. *Crapo* at 23–24. The human body's defense mechanism creates macrophages that are capable of engulfing the chrysotile fiber, leaching the magnesium out of the crystalline structure, weakening the fiber, and causing it to fragment into tiny fibrils which are ultimately physically removed from the body. *Crapo* at 23–25.

The prevailing scientific and medical view is that amphibole asbestos fibers have a significantly greater propensity to cause disease than chrysotile asbestos. Specifically, amphiboles are known to be a much more potent cause of pleural mesothelioma than chrysotile. *Hammar* at 28. In fact, amphiboles can be up to 100 to 500 times more potent than chrysotile in causing mesothelioma. *Id.; Dr. Victor Louis Roggli's Trial Testimony* ("Roggli") at 17.

While aboard the vessels, Lindstrom had significant asbestos exposure to a variety of friable asbestos-containing products. *Lindstrom Depo.* at 21. Lindstrom repeatedly was exposed to asbestos pipe insulation, asbestos boiler insulation, asbestos block, asbestos blankets, and asbestos wallboard. *Lindstrom Depo.* at 22, 27, 30, 35, 57, 117; *Horace Clinton George's Trial Testimony* ("George")at 66. These exposures were significant because the forego-

ing products are friable asbestos products. *Buccigross* at 289. These products, due to their friability, released significant quantities of asbestos fibers into the air on these vessels. *George* at 66; *Dr. Frederick M. Toca's Trial Testimony* ("Toca") at 46. Friable asbestos products release thousands of times more fibers than encapsulated products, even if the percentage of asbestos in the products is the same. *Toca* at 46.

Lindstrom often was either working with friable asbestos-containing products, or was in the vicinity of these products, and undoubtedly inhaled significant quantities of asbestos fibers released by friable products. *Lindstrom Depo.* at 27. Another reason these exposures were significant in connection with the causation of Lindstrom's disease is that several of the insulation products contained amosite asbestos. *Lemen* at 62–63.

Periodically, Lindstrom also was required to replace gasket and packing material on various valves, pumps, and pipe flanges. *Lindstrom Depo.* at 40; *George* at 18. As Lindstrom was promoted from Third to Second, to First and, ultimately, Chief Engineer, however, his duties changed to a more supervisory capacity requiring more technical knowledge. *George* at 57–60. Accordingly, he spent only 10 percent of his time working with gaskets or packing. *George* at 60. This Court concludes that it became less and less likely that Lindstrom would perform hands-on gasket and packing replacement as he was promoted up the ranks.

It was impossible to determine the manufacturer of any gasket or packing material being removed. *George* at 54. In installing new gasket and packing material, Lindstrom occasionally used products manufactured or supplied by John Crane. *Lindstrom Depo.* at 42, 44, 47. The only John Crane products used by Lindstrom during his merchant mariner career were gaskets and valve/pump packing. *Id.; George* at 18. Certain of these products contained asbestos, although not all were asbestos containing. *Lindstrom Depo.* at 147; *Dr. James R. Millette's Trial Testimony* ("Millette") at 21–22. Lindstrom specifically identified John Crane 6AM packing. *Lindstrom Depo.* at 146.

The John Crane asbestos-containing products contained only chrysotile. There were no contaminants, or any type of asbestos fiber other than chrysotile, in the John Crane products. *Millette* at 130–133; *Dr. Michael Matteson's Trial Testimony* ("Matteson") at 319.

A fundamental concept in industrial hygiene is a time weighted average. *Toca* at 19–20. Asbestos exposure is generally measured in fibers per cubic centimeter ("f/cc") on an eight hour time weighted average. This is calculated by taking the amount of time that an individual is exposed to asbestos and mathematically calculating a time weighted average over an eight hour day. *Toca* at 20. One of the purposes of time weighting is to give industrial hygienists the ability to add each task a worker performs, and then break down the exposure from a particular task. *Toca* at 17.

In all urban environments, there is a level of asbestos in the ambient air. This level, often called background level, varies from location to location and ranges from .000001 to .01 f/cc. Dr. Victor Roggli, a pathologist who has studied asbestos extensively, and who testifies frequently for both plaintiffs and defendants, testified that the highest background level has been estimated to be 0.01 f/cc on an eight hour time weighted average. *Roggli* at 33–34. Dr. Roggli explained that it is important to use the highest known background levels in assessing threshold dose and risk because if there is no evidence that exposure

608

at these levels cause disease, exposures at lower levels certainly do not. *Roggli* at 63–64. The highest background levels of asbestos are not known to cause harm in humans. *Lemen* at 65. If a product releases asbestos fibers in amounts equal to or less than background levels, the prevailing view is that it cannot be a cause of harm to humans. *Roggli* at 64. Mr. Buccigross tested John Crane products and found that they remained intact and did not become friable even after being put through an accelerated aging process. *Buccigross* at 284–85. Accelerated aging is a process that simulates a long term aging of a product by exposing it to abnormally high heat, pressure or oxygen concentrations. *Buccigross* at 276–78.

Dr. Matteson conducted asbestos fiber release tests on John Crane gaskets and packing, including 6 AM packing, the only John Crane product specifically identified by Lindstrom. These tests were conducted pursuant to accepted and reliable scientific methods. *Matteson* at 321. Cutting and installing 6 AM packing released no asbestos fibers. *Id.* Removing 6 AM packing released fibers well below background levels. *Matteson* at 330–32. Dr. Matteson also tested numerous other John Crane gaskets and packing products, both during installation and removal. The highest fiber release level found in *any* John Crane product was 0.0062 fibers per cubic centimeter of air on an eight hour time weighted average. *Matteson* at 335. Dr. Toca performed similar tests and achieved similar results. *Toca* at 48–49.

The John Crane fiber release level of, at most, 0.0062 f/cc is below background and therefore cannot be considered harmful. Dr. Hammar admitted that a fiber release level at this amount could not be considered a substantial contributing factor in causing mesothelioma. *Hammar* at 56. This contradicts the testimony of Dr.

Frank, who expressed the opinion that none of Lindstrom's exposures, including background, could be separated and that, therefore, all of his exposures were substantial. *Dr. Arthur Leonard Frank's Trial Testimony* ("Frank") at 239.

Plaintiff produced no evidence to contradict Dr. Matteson's testimony regarding the fiber release of John Crane products. Plaintiff's fiber release expert, Dr. Millette, testified as to the fiber release levels of unknown manufacturers' products. Such testing has limited relevance to the fiber release levels of John Crane products. He never actually tested John Crane products to determine fiber release levels, despite the fact that he has had in his possession some John Crane packing material for more than ten years. *Millette* at 120–21. Additionally, he is in possession of the air filter from the test he performed on the John Crane gasket seen on the video that was presented at trial. He has never performed any analysis of that filter to determine possible fiber release levels. *Millette* at 136.

The low fiber release levels of John Crane gaskets and packing are consistent with the published literature. The authoritative 1978 publication entitled *Asbestos and Disease*, by renowned asbestos researcher Dr. Irving Selikoff, found that these products presented "no health hazard in forms used in shipyard applications." *Lemen* at 58–60. This publication reflected the state of the art in 1978. *Id.* Shipyard applications are similar to those aboard ships. *Lemen* at 60.

Plaintiff presented Dr. Richard Lemen as his expert in environmental and occupational health. Dr. Lemen is the former deputy director of NIOSH, an Assistant Surgeon General, has many years of prominent public service and has significant experience with asbestos literature. *Lemen* at 5–12. Dr. Lemen admitted that as late

as 1999, it was his opinion that gaskets and packing did not pose a health risk to workers using these products. *Lemen* at 68. Indeed, Dr. Lemen testified that in 1994, when he was acting Director of NIOSH, he would have stated that he had no evidence that gaskets and packing posed an excessive risk to workers. *Lemen* at 69. Dr. Lemen further admitted that the U.S. Government has never banned the use of asbestos-containing gaskets and packing and has never required warning labels on these products. *Id.* Dr. Lemen testified that there are no medical articles that state exposure to gaskets or packing alone cause any asbestos related disease. *Lemen* at 68. Prior to 1999, there were no studies even suggesting that gasket or packing might pose a health hazard to humans. *Id.*

Peritoneal mesothelioma, like all other asbestos related diseases, is dose related. Therefore, the higher the dose, the higher the risk of contracting the disease. *Lemen* at 65. Peritoneal mesothelioma is a form of cancer of the peritoneum. *Hammar* at 22. The peritoneum is the thin membrane that surrounds the organs within the abdomen. *Hammar* at 21. The pleura is the thin membrane that surrounds the chest cavity. *Id.* Peritoneal mesothelioma is a different disease than pleural mesothelioma. *Hammar* at 22.

Although both diseases are rare, pleural mesothelioma is much more common than peritoneal mesothelioma. *Lemen* at 48. It takes approximately 10 times more asbestos in the lungs to cause peritoneal mesothelioma than pleural mesothelioma. This is because the pleural mesothelial tissue that surrounds the lungs is much more likely to receive asbestos fibers that were inhaled into the lungs. It is much more difficult for asbestos fibers to translocate from the lungs to the abdomen. *Crapo* at 30–32; *Roggli* at 44–47; *Lemen* at 49.

While both diseases can be caused by asbestos, the etiology and manner of causation differ. *Crapo* at 21–46. With pleural mesothelioma, the fibers inhaled into the lung have a relatively easy path of travel to reach the pleura just outside the lung. However, the fibers have a much more difficult path of travel to the peritoneum, due to its location in the abdomen. The most likely pathway is for the fibers to travel on the mucociliary escalator up to the back of the throat where they would be swallowed thereby entering the gastrointestinal tract. From there the fibers would pass through the GI tract outward and into the peritoneum. *Crapo* at 15.

Due to the different physical characteristics between chrysotile and amphibole asbestos fibers, and due to the location of the peritoneal mesothelial versus the pleural mesothelial tissue, chrysotile has not been shown to be a cause of peritoneal mesothelioma. *Crapo* at 46. Dr. Lemen specifically testified that there is no evidence that chrysotile is a potent cause of peritoneal mesothelioma. *Lemen* at 76. One reason for this is that chrysotile, due to its different physical characteristics, has a relatively short half-life of 90 days. Amphiboles, including amosite, are a potent cause of pleural mesothelioma due, in part, to their seven year half-life. *Crapo* at 22. Therefore, the human body has the ability to break down and remove chrysotile at rates much faster than it can remove amphiboles. *Id.*

Mesothelioma is caused when asbestos fibers interact with mesothelial cells and cause changes. Some of these cells become irritated, some of them increase in number, some of them die, and some of them get genetic mutational changes. If a precise series of changes takes place, one cell becomes a malignant cell. A mesothelioma tumor consists of billions of cells but started from one single cell. Attempting

to find that one cell to determine which fiber caused the initial malignancy is like "looking for a needle in a haystack." *Roggli* at 23–24.

Even if one assumes chrysotile can cause peritoneal mesothelioma, it must be inhaled in massive quantities, far in excess of the possible exposure of a worker over many lifetimes. *Roggli* at 44–47. One reason for this is because the half-life of chrysotile fibers in the human body is 90 days. At this half-life, one million chrysotile fibers would be reduced to a tiny fraction of a fiber in just 7 years. *Crapo* at 22. Amphibole asbestos, however, has a half-life of 7 years. Thus, one million amphibole fibers would be reduced only to 500,000 fibers after the same 7 year period. *Id.* An amphibole fiber, therefore, with its ability to survive much longer in the body than a chrysotile fiber, is more easily translocated from the lungs to the abdomen, one reason why amphiboles are a potent cause of peritoneal mesothelioma. *Id.*

Mesothelioma is a disease that has a latency period of at least 15 years. Thus, it takes at least 15 years from a person's first exposure to asbestos for the disease to manifest itself. *Dr. Yasunosuke Suzuki's Videotape Deposition*, February 16, 2004 at 4. Since Lindstrom was diagnosed with the disease in 1999, any exposures to asbestos after 1984 cannot be considered a factor in the cause of his peritoneal mesothelioma. *Dr. Suzuki's Rebuttal Videotape Deposition*, March 5, 2004, at 35.

### CONCLUSIONS OF LAW

■ To prevail on a products liability asbestos claim, a plaintiff must: 1) identify an asbestos-containing product for which defendant is responsible; 2) prove that he has suffered damages; and, 3) prove that defendant's asbestos-containing product was a substantial factor in causing his damages. *Roberts v. Owens–Corning Fi-*

*berglas Corp.*, 726 F.Supp. 172, 174 (W.D.Mich.1989); *Stark v. Foster Wheeler Company, Inc.*, Nos. 94 CV 11464, 98 CV 20002, (N.D.Ohio Feb. 18, 1999) (Polster, J), *aff'd, Stark v. Armstrong World Industries, Inc.*, 21 Fed.Appx. 371, 376 (6th Cir. Oct.3, 2001) (unpublished). The Sixth Circuit recently held that in order to establish a circumstantial case a plaintiff must show a substantial exposure to a particular defendant's product for a substantial period of time. *Stark*, 21 Fed.Appx. at 380–81.

Under a negligence theory, the plaintiff first must prove that the defendant did some act which a reasonably prudent person would not do, or failed to do some act that a reasonably prudent person would do, when prompted by considerations which ordinarily regulate the conduct of human beings. 3 Fed. Jury Prac. & Instr. § 120.02 (5th ed.) The plaintiff must also prove that the defendant's negligence was a proximate cause of some injury and consequent damage sustained by the plaintiff. 3 Fed. Jury Prac. & Instr. § 120.03 (5th ed.) The correct standard for proximate cause in the asbestos context is the "substantial factor" test. *Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1464 (6th Cir.1993).

Therefore, to prevail at trial, Plaintiff was required to prove by a preponderance of the evidence that Lindstrom had a substantial exposure for a substantial period of time to John Crane's asbestos-containing products, and that these exposures were a substantial contributing factor in causing his peritoneal mesothelioma. The Court concludes that Plaintiff has not met this burden.

■ Since the John Crane products used by Lindstrom contained at least partially encapsulated asbestos, their propensity to release respirable fibers was much less than those of the friable pipe, boiler,

and blanket insulation products which were also on the vessels which Lindstrom sailed. The only hard evidence in this case regarding the fiber release of John Crane products is that the release was below background levels. All except two of the experts in this case agreed that exposure to asbestos at or below background levels does not cause disease, and certainly not peritoneal mesothelioma.

The two experts who disagreed, Dr. Frank and Dr. Suzuki, testified that every exposure to asbestos Lindstrom had during his working career, no matter how small, was a substantial factor in causing his peritoneal mesothelioma. This testimony is inconsistent with that of two other plaintiff's experts, Dr. Hammar and Dr. Lemen, the defense experts, and the medical and scientific literature. Moreover, this Court has already ruled in its Memorandum of Opinion and Order of May 2, 2003 that "each and every" exposure Lindstrom had cannot be considered a "substantial factor" in the development of his peritoneal mesothelioma. An opinion identical to those of Drs. Frank and Suzuki was put forth by plaintiff's expert, Dr. Joseph Corson, who submitted an affidavit in response to other defendants' motions for summary judgment. In the affidavit, Dr. Corson stated "[e]ach of Mr. Lindstrom's occupational exposures to asbestos aboard ship to a reasonable degree of medical certainty were a substantial factor to his development of mesothelioma. The medical and scientific community cannot exclude any specific asbestos exposure as to Mr. Lindstrom's mesothelioma." Affidavit of Dr. Corson, ¶ 5. This court stated that "Dr. Corson does not specifically reference the product of any particular defendant. Rather, he opines that there is no safe level of asbestos exposure, and that every exposure to asbestos, however slight, was a substantial factor in causing Lindstrom's disease. If an opinion such as

Dr. Corson's would be sufficient for plaintiff to meet his burden, the Sixth Circuit's 'substantial factor' test would be meaningless." ECF No. 168, May 2, 2003 Memorandum and Opinion, at 5.

In addition, the opinion of Dr. Frank, that every breath Lindstrom took which contained asbestos could have been a substantial factor in causing his disease, is not supported by the medical literature. The Court therefore accords less weight to Dr. Frank's opinions on causation of asbestos related disease as a whole than it gives to a number of the other experts who testified.

■ Plaintiff also failed to meet his burden of proof in his negligence claim. There was no evidence that John Crane did not take reasonable care in designing or manufacturing its products. The principal negligence argument advanced by Plaintiff is that John Crane had a duty to warn consumers of the potential hazards of the products. First, as noted above, Plaintiff has failed to prove that the products used by Lindstrom were hazardous. In addition, the uncontradicted testimony is that there was no literature even suggesting that gaskets and packing might present a health hazard to humans until 1999; that there is still no literature establishing that gaskets and packing cause disease; that gaskets and packing have never been banned by the Environmental Protection Agency; that the acting director of NIOSH had no evidence that gaskets and packing were hazardous when Lindstrom retired; and that the literature affirmatively stated that there were no health hazards presented by gaskets and packing. Accordingly, John Crane had no duty to warn, because there was no information available suggesting there was any condition requiring a warning. There is no

duty to warn of unknown and unknowable hazards.

Accordingly, for the foregoing reasons, this Court enters a verdict in favor of Defendant, John Crane.

**IT IS SO ORDERED.**