Rachel KRUMPELBECK, Plaintiff,

v.

BREG, INC., et al., Defendants.

No. 1:09–cv–91.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 27, 2010.

Ronald E. Johnson, Jr., Paul J. Schachter, Penny Unkraut Hendy, Schachter & Hendy, PSC, Ft. Wright, KY, Stephanie M. Day, Brett Colbert Goodson & Company Ltd., Cincinnati, OH, for Plaintiff.

Kim M. Schmid, Barry J. Koopmann, Monica K. Gould, Molly J. Given, Bowman and Brooke LLP, Minneapolis, MN, Nancy Ann Lawson, Dinsmore & Shohl, Cincinnati, OH, for Defendants.

## ORDER THAT: (1) DEFENDANT BREG, INC.'S MOTION FOR SUMMARY JUDGMENT (Doc. 49) BE GRANTED; AND (2) THIS CASE BE CLOSED

TIMOTHY S. BLACK, District Judge.

This civil action is before the Court on Defendant Breg, Inc.'s motion for summary judgment (Doc. 49) and the parties' responsive memoranda (Docs. 52, 63, 64, 71).

### I. BACKGROUND FACTS

Plaintiff underwent arthroscopic surgery on her shoulder. After the surgery, her physician prescribed and implanted the catheter of a Breg Pain Care infusion pump to administer local anesthetic for pain control. Plaintiff alleges that as a result of the pump, she developed chondrolysis[1] and has suffered serious progressive, permanent, and incurable injury.

Plaintiffs complaint asserts seven counts against Defendant: (1) strict liability—design defect; (2) strict liability-warning defect; (3) strict liability—nonconformance with representations; (4) negligence; (5) breach of express warranty; (6) breach of implied warranty; and (7) negligent misrepresentation and fraud.[2] Defendant

---

1. Chondrolysis is the rapid loss of joint cartilage following some chemical, mechanical, infectious, immunological, or thermal insult. (*See* Daniel J. Soloman, *et al.*, Glenohumeral Chondrolysis After Arthroscopy: A Systematic Review of Potential Contributors and Causal Pathways, Arthroscopy 25:11:1329 (2009), Doc. 51, Ex. 5). The result of this cartilage loss is a joint that no longer has a smooth gliding surface to cover the ends of the bone, so essentially the joint rubs bone against bone causing pain and stiffness. (Doc. 52, Ex. 6). Chondrolysis has been reported in the shoulder, hip, knee, and ankle. (*Id.*)

2. There are approximately 200 pain pump cases being litigated around the country. In August 2008, the Judicial Panel on Multidistrict Litigation ("MDL") denied a motion for centralization. At that point, the docket involved a total of 13 actions, as well as 18 potential tag-along actions. When the litigation grew to 102 actions with 70 tag-alongs, the plaintiffs tried again. However, on April 14, 2010, the MDL again declined to consolidate the federal product liability cases involving pain pumps. The Court found that individual issues of causation and liability predominated and remain likely to over-

challenges Plaintiff's ability to prove these claims on one basic premise: Defendant was under no duty to warn of the risk of chondrolysis because it was reasonably unaware of the risk, and even if it did have a duty to warn, Plaintiff cannot show that a failure to warn caused her chondrolysis.

## II. UNDISPUTED FACTS

1. On February 1, 2005, Plaintiff Rachel Krumpelbeck dislocated her right shoulder while playing basketball. (Pl.'s Dep. at 36).

2. On March 3, 2005, Plaintiff underwent arthroscopic surgery on her right shoulder. (Doc. 1 at ¶ 27). The surgery was performed by Dr. Paul Favorito. (Doc. 55 at 26).

3. Following surgery, Dr. Favorito prescribed and applied a Breg Pain Care 4200 pain pump to provide continuous infusion of anesthetic into Plaintiff's shoulder joint to manage her postoperative pain. (Doc. 55 at 28–29, 56–57, 107, 117–118; Doc. 1 at ¶ 27). Through the Breg Pain Care 4200 and its catheter, Dr. Favorito infused 200 ml of 0.5% Marcaine with epinephrine into Plaintiff's shoulder joint at a rate of 2 ml per hour. (Doc. 55 at 30, 56, 67–68; Doc. 1 at ¶ 29).

4. Dr. Favorito testified that he had enjoyed good experiences with pain pump use for his patients in terms of pain relief. (Doc. 55 at 57). He found that because of their use of a pump, patients for whom he prescribed pain pumps following surgery consumed fewer oral narcotics. (*Id.* at 57).

5. Plaintiff claims that she subsequently developed glenohumeral (shoulder) chondrolysis and was diagnosed with that condition in December 2007. (Doc. 1 at ¶ 30).

6. The Pain Care 4200 is a portable infusion pump-a delivery mechanism for the continuous flow of pain medication. The device contains a 200 cc fluid reservoir, and the fluid put into the reservoir flows out of the fluid reservoir and through the catheter at the rate of 2 ccs per hour. (Special 510(k): Device Modification for the Pain Care 4200 at 3, Doc. 71, Ex. 4).

7. Breg's Pain Care pumps are class II devices. (*Id.*)[3]

whelm any efficiencies that might be gained by centralization. For example, the Court noted that pain pumps come in different sizes and designs, with differing volume, duration, and flow capacities; the same anesthetic was not used in all surgeries; and the plaintiffs have different medical histories. Moreover, the Court found that "[a]lthough proponents of centralization argue that the scientific data and clinical studies demonstrate that the continuous infusion of anesthetic into the joint space destroys cartilage, the record indicates that the science is, in fact, not so certain." *In re Ambulatory Pain Pump-Chondrolysis Prods. Liab. Litig.*, 706 F.Supp.2d 1362, 1365 n. 3 (M.D.L.2010). There were at least seven lawsuits filed against the manufacturer in this case, Defendant Breg. *See, e.g., Kilpatrick v. Breg, Inc.* 613 F.3d 1329 (11th Cir.2010) (affirming district court's grant of summary judgment for Breg); *Martinez v. Breg, Inc.*, No. 10–2775 (D.Minn) (pending); *Ruddick v. Breg*, No. 10–234 (D.Minn) (pending); *Burns v. Breg*, No. 10–672 (D.Minn) (pending); *White v. Breg*, 3:10cv102 (N.D.Fla.) (pending); *Peterson v. Breg*, 2:09cv2044, 2010 WL 2044248 (D.Ariz.2010) (dismissed for failure to identify who manufactured the pain pumps); *Suhn v. Breg*, 08–4190 (D.S.D.) (pending)

3. Plaintiff agrees that the Breg Pain Care pumps are class II devices with respect to the uses that were cleared by the FDA, but denies that the pumps are class II devices with respect to intra articular use, which was not cleared by the FDA.

8. Breg prepared and filed with the FDA a 510(k) submission for the Pain Care 4200. (*Id.*)
9. On April 4, 2002, the FDA cleared the Pain Care 4200, which allowed Breg to legally distribute the device in the United States according to the following indications for use: "The Pain Care 4200 is indicated to provide continuous infusion of a local anesthetic for the post-operative management of pain." (FDA clearance letter (April 4, 2002) at 1–3, Doc. 51, Ex. 4).
10. Based upon the FDA's action, Breg was cleared to market its device in accordance with the cleared indicated use. (*Id.* at 2).
11. Chondrolysis is the rapid loss of joint cartilage following some chemical, mechanical, infectious, immunological, or thermal insult. (Doc. 51, Ex. 5).
12. At the annual meeting of the American Academy of Orthopaedic Surgeons ("AAOS") on March 23, 2006, Dr. Brent Hansen discussed for the first time the development of chondrolysis and a possible relationship to "higher flow rate" (4.16 ccs per hour) pain pumps used in the intra-articular space of the shoulder. (Tr. of B. Hansen Podium Presentation (Mar. 23, 2006) at 6–7, Doc. 71, Ex. 5).
13. Dr. Hansen noted during the presentation that "we're not sure what the exact etiology is," and, in conclusion, stated that "chondrolysis may be related to high rate volume intraarticular pain pump catheters with bupivacaine and epinephrine." (*Id.* at 2, 7).
14. This AAOS annual meeting occurred more than one year after Plaintiffs surgery. (*Id.* at 1).
15. Dr. Hansen stated in his follow-up article that "[t]he cause of [postarthroscopic glenohumeral chondrolysis] is unknown, it "has yet to be etiologically defined," and he noted that "[i]t is likely that other unrecognized factors are also involved." (*See* Brent P. Hansen, *et al., Postarthroscopic Glenohumeral Chondrolysis,* Am. J. Sports Med. 35:10:1628, 1632–33 (2007), Doc. 51, Ex. 6).[4]
16. Dr. Hansen's article—the first article in the world literature articulating a possible association between postarthroscopic glenohumeral chondrolysis and continuous intra-articular infusion of anesthetic via pain pump—was not in print until October 2007, more than two years after Plaintiffs surgery. (*Id.*) [5]
17. Dr. Favorito, one of Plaintiff's non-retained expert witnesses in this

4. The study did not account for other causes of chondrolysis—specifically noting that "[i]t is likely that other unrecognized factors are also involved ... [and that other factors] may have played a role not yet completely understood at this time." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1337–38 (11th Cir.2010) (concluding that the Hansen study was unreliable because it did not explain whether it was statistically meaningful to extrapolate from such a small sample size—that 12 shoulders developing chondrolysis out of 19 shoulders in which pain pumps were placed was not a reliable indicator of causation because 40% of the shoulders did not develop the condition).

5. Plaintiff agrees that this article was *among* the first to conclude that there is an association between "postarthroscopic glenohumeral chondrolysis" and continuous intra-articular infusion of anesthetic via pain pump. Plaintiff points to additional articles published before the Hansen article which allegedly indicate that continuous intra-articular infusion or injection could cause cartilage damage, including chondrolysis. (Doc. 52, Exs. 17–25).

case, believes that the first time he became aware of post-arthroscopic glenohumeral chondrolysis ("PAGCL") was upon reading the Hansen article in October 2007. (Doc. 55 at 28).

18. Dr. Favorito can point to no scientific studies or articles published by March 2005 noting a possible association between the infusion of anesthetic into the shoulder joint and chondrolysis. (Doc. 55 at 100).

19. Dr. Favorito can point to no scientific studies or articles published by March 2005 concluding that the infusion of anesthetic into the shoulder joint causes chondrolysis. (Doc. 55 at 100).

20. Dr. Favorito agrees that as of March 2005, there were no publicly available peer-reviewed articles, abstracts, case reports, case series, books, or treatises in which someone concluded that the intra-articular continuous infusion of anesthetic caused chondrolysis. (Doc. 55 at 111).

21. Dr. Favorito admits that even today, no peer-reviewed published articles state that the infusion of anesthetic into the shoulder joint causes chondrolysis. (Doc. 55 at 14–25).

22. Dr. Favorito's August 25, 2008 report regarding Plaintiff corrects a prior misrepresentation by Plaintiff's counsel, and states: "1 wanted to make one clarification about a statement you made in the second paragraph on July 11, 2008. I neither stated nor implied at our meeting on July 1st that Breg promoted the use of the pain pump intra-articularly for better pain relief." (Doc. 71, Exs. 6, 7; Doc. 55 at 18–19).

23. According to Plaintiff's expert, Dr. Samer Hasan, orthopedic surgeons performing a high volume of shoulder arthroscopies first became aware of a potential association between the use of a pump to deliver the continuous infusion of local anesthetics and the development of glenohumeral chondrolysis "sometime between October 2007 and [June 2010]." (Doc. 71, Ex. 9 at 229). Prior to October 2007, according to Dr. Hasan, there were no peer-reviewed articles noting a possible association between the infusion of anesthetic into the shoulder joint and chondrolysis. (*Id.* at 230–231).

## III. DISPUTED ISSUES OF FACT

1. The intra-articular use of pain pumps can cause chondrolysis. (Doc. 54 at 117–118); Doc. 52, Ex. 45, E. Fester and F. Noyes, *Postoperative Chondrolysis of the Knee: 3 Case Reports and a Review of the Literature*, AM. J. SPORTS MED. (Jun 17, 2009) (E-pub ahead of print); Doc. 52, Ex. 46, B. Busfield and D. Romero, *Current Concepts: Pain Pump Use After Shoulder Arthroscopy as a Cause of Glenohumeral Chondrolysis*, 25(6) J. ARTHROSCOPIC RELATED SURG. 647–652 (June 2009); Doc. 52, Ex. 44, M. Slaubaugh, *et al., supra;* Doc. 52, Ex. 53, *Zink v. SMI Liquidating, Inc.*, 2:08–cv–95, Memorandum Opinion and Order, Doc. 148, 5 (E.D. KY 5/07/10) (noting that defense expert Dr. Damon Petty has admitted that it is "well described and accepted in the [orthopedic] community" that intra-articular pain pump use can cause chondrolysis).

2. Plaintiff Rachel Krumpelbeck developed chondrolysis as a result of her intraarticular use of a Breg pain pump. (Doc. 71, Ex. 8 at 27–28: "[I]n Miss Krumpelbeck's case ... each of the other causes were systematically excluded leaving no other explanation for the chondrolysis in Miss Krumpelbeck's shoulder but the intra-articular pain pump that was placed in her shoulder at the time of her index surgery on March 3, 2005 as being the cause.").

3. The FDA has never approved any pain pump for use in the joint space. (Ex. A, FDA *Information for Healthcare Professionals—Chondrolysis Reported with Continuously Infused Local Anesthetics (marketed as bupivacaine, chlorprocaine, lidocaine, mepivacaine, procaine and ropivacaine):* "The FDA has not cleared any infusion devices with an indication for use in intra-articular infusion of local anesthetics.").

4. The FDA did not approve or clear any of the Breg Pain Care pain pumps, including the Pain Care 4200, for use in the joint space or for orthopedic surgery. (Doc. 52, Exs. 1, 2, 7, 9, 16).

5. The FDA refused to approve the Breg Pain Care pain pumps, including the Pain Care 42000, for use in the joint space or orthopedic use under the 510(k) process because no prior device had been approved for such use, and Breg had not established that such use was safe. (*Id.*)

6. As the Breg pain pumps were not cleared for use in the joint space or orthopedic use, Breg was not cleared by the FDA to market its pain pumps for use in the joint space. (*Id.*)

7. Breg promoted its pain pumps for use in the joint space to the orthopedic community in general. (Doc. 52, Exs. 54, 57).

8. Breg promoted its pain pumps for use in the joint space to Dr. Favorito, the Plaintiff's orthopedic surgeon:

[W]hen they came to me with the catheter that had a Y port to it, they said, "You can put one limb of it into the joint. . . ." . . . So basically what they're saying is, "We made a device that you can put into the joint and outside of the joint. . . ." . . . So why shouldn't we put it in the shoulder ? If there was data that suggested we shouldn't, I would have liked to know that data. (Doc. 55 at 138–139).

9. Medical literature published prior to the Plaintiff's March 3, 2005 surgery indicated that the continuous exposure of joint cartilage to local anesthetics or other solutions could permanently damage the cartilage. This literature thereby indicated that the continuous infusion of local anesthetics into the joint space was not safe because of the potential damage to cartilage. (Doc. 52, Ex. 17, Key, Albert J., "The Production of Chronic Arthritis By the Injection of Weak Acids, Alkalies, Distilled Water, and Salt Solution into Joints," J Bone Joint Surg Am, 1933; 15:67–84; Ex. 18, Reagan, Brian F., *et al.*, "Irrigating Solutions for Arthroscopy, A Metabolic Study," J Bone Joint Surg Am, 1983; 65A, No 5, 629–31.8; Ex. 19, Nole, Roberta, *et al.*, "Bupivacaine and Saline Effects on Articular Cartilage," Arthroscopy, 1985:

1(2): 123–7; Ex. 20, Fulkerson, John P., *et al.*, "Articular Cartilage Response to Arthroscopic Surgery: A Review of Current Knowledge," Arthroscopy, 1986; 3:184–89; Ex. 21, Neidel, J., *et al.*, "Intraarticular Injections and Articular Cartilage Metabolism: An experimental study in rabbits.," Arch Orthop Trauma Surg, (1992) 111:237–242; Ex. 22, Jurvelin, J.S., *et al.*, "Effects of Different Irrigation Liquids and Times on Articular Cartilage: An Experimental, Biomechanical Study," Arthroscopy, 1994; 10(6):667–672; Ex. 23, Bulstra, S.K., *et al.*, "The Effect In Vitro of Irrigating Solutions on Intact Rat Articular Cartilage," J Bone Joint Surg [Br], 1994; 76–B:468–70; Ex. 24, Dogan, *et al.* The effects of bupivacaine and neostigmine on articular cartilage and synovium in the rabbit knee joint. *J Int Med Res* 2004; 32: 513–519; Ex. 25, Petty, *et al.* Glenohumeral Chondrolysis After Shoulder Arthroscopy: Case Reports and Review of the Literature. *American Journal of Sports Medicine.* 2004;32(2):509–515).

10. As a result of a detailed search of the medical literature in 2006, Breg employee, Patrick Cawley, discovered multiple articles published prior to 1999 "which discuss issues of chondrotoxicity when cartilage materials interacted with various chemicals" and thereby indicated a risk of chondrolysis from continu-

ous infusion of local anesthetics. (Doc. 71 at 45, 51–52).

## IV. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986).

## V. ANALYSIS

### A. Warnings Claims

Under Ohio's Product Liability Act[6] ("OPLA"), Ohio Rev.Code §§ 2307.71–.80, a product is defective due to inadequate

---

6. Ohio Rev.Code § 2307.71(A)(13) defines a product liability claim as "a claim or cause of action ... that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from ...:(a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product; (b) Any warning or instruction, or lack of warning or instruction, associated with that product; (c) Any failure of that product to conform to any relevant representation or warranty.

warnings or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:

> (a) The manufacturer *knew or, in the exercise of reasonable care, should have known* about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

Ohio Rev.Code Ann. § 2307.76(A)(1) (emphasis added).

### 1. Foreseeability

■ Defendant argues that it did not have a duty to warn of the alleged risk of chondrolysis because it was reasonably unaware of the risk. "There is no duty to warn of unknown and unknowable hazards." *Bartel v. John Crane, Inc.*, 316 F.Supp.2d 603, 611–12 (N.D.Ohio 2004). The test focuses on the state of knowledge at the time the product left the manufacturer's hands and at the time the product was used. Where a plaintiff in a products-liability action "fail[s] to raise a genuine issue of fact as to whether his injury was reasonably foreseeable," the defendant is entitled to summary judgment. *Ralph v.*

*Dallas Corp.*, No. 91–3793, 1992 WL 92741, at *5, 1992 U.S.App. LEXIS 8484, at *13 (6th Cir. Apr. 22, 1992) (applying Ohio law).

Plaintiff claims that whether Defendant should have known pain pumps could kill cartilage is an issue of fact for a jury. Specifically, Plaintiff alleges that Defendant has repeatedly been put on notice since 1998 (through case law, literature, internal emails, FDA violations, and testing failures), that its pumps should not be used in the joint space.

### a. Case Law

■ Plaintiff maintains that *Schott v. I-Flow Corp.*, 696 F.Supp.2d 898 (S.D.Ohio 2010) (J. Spiegel), is instructive in the instant case.[7] The allegations in *Schott* mirrored this case, and the causes of action arose under the OPLA. Judge Spiegel ultimately denied the defendant pain pump manufacturer's motion for summary judgment. However, unlike the instant case, the decision focused on the admissibility of expert testimony. Defendant's summary judgment motion was premised on the theory that plaintiffs did not adduce reliable expert opinions supporting general causation. *Id.* at 905. Judge Spiegel held that the opinions were reliable and plaintiffs proffered sufficient evidence that defendant knew in October 2006[8] that its pain pump could be causing chondrolysis. *Id.* at 906.

Defendant cites two cases where federal courts granted summary judgment to manufacturer defendants in similar cases. In *Meharg v. I–Flow Corp.*, No. 1:08–cv–184–

---

7. This Court is not bound by the decisions of its fellow District Judges. *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir.1991) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court."). *See also Cooper v. Hudsman*, No. 3:07cv610, 2008 U.S. Dist. LEXIS 37070, at *23 (N.D.Ohio May 5, 2008). Also noteworthy is the fact that *Schott* was published nearly five

months before the Eleventh Circuit's decision in *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 (11th Cir.2010), discussed *supra*, fn. 5.

8. Plaintiff's surgery took place on March 3, 2005—approximately 19 months before the surgery in *Schott*. (Doc. 1 at ¶ 27). Therefore, the fact that the court found that sufficient evidence existed over a year later is inapplicable to the instant case.

WTLTAB, 2010 WL 711317, 2010 U.S. Dist. LEXIS 18517 (N.D.Ind. Mar. 1, 2010), the United States District Court for the Southern District of Indiana resolved precisely the same warnings issues that Plaintiff raises in this instant case. *Id.* at *1, 2010 U.S. Dist. LEXIS 18517 at *3–4. Granting an anesthetic manufacturer's motion for summary judgment, the court held that "the duty to warn ... does not arise until the manufacturer knows or should know of the risk. Dr. Parisian urges a far broader duty—a duty to warn physicians that there might be a risk, but we don't know yet because we (and the scientific community at large) haven't studied it yet." *Id.* at *4, n. 9, 2010 U.S. Dist. LEXIS 18517 at *4, n. 9.[9]

 Similarly, in *Phillippi v. Stryker*, the Eastern District of California held that

"[t]he undisputed evidence clearly shows that the scientific and medical knowledge available at the time of Plaintiffs surgery did not and could not require Stryker to in any way change its warnings" to include a warning regarding chondrolysis as this was an unforeseeable risk.[10] No. 2:08–CV–02445–JAM–KJN, 2010 U.S. Dist. LEXIS 66470, at *3 (E.D.Cal. July 16, 2010).[11] *Meharg* and *Phillippi* are squarely on point as Ohio law also requires proof that a product manufacturer knew or should have known of the risk involved before a duty to warn arises.[12] Indeed, Ohio law shields a manufacturer from liability when the risk involved was not and could not have been known prior to the plaintiff's alleged injury. Ohio law restricts the duty to warn to known or knowable risks.

9. Plaintiff claims that *Meharg* is distinguishable from the instant case because the only party to whom summary judgment was granted was the manufacturer of the local anesthetic, not the manufacturer of the pain pump. Plaintiff claims that manufacturers of local anesthetics cannot be held responsible for a new untested use of their product that arises solely via a mechanism created by a new medical device. Despite this distinguishing factor, it does not change the analysis that the duty to warn does not arise until the manufacturer knows or should know of the risk.

10. The surgery at issue in *Phillippi* took place in July 2005–four months *after* Plaintiff's surgery. *Phillippi*, U.S. Dist. LEXIS 66470 at *1.

11. Plaintiff claims that *Phillippi* is similarly flawed because the judge in that case specifically noted that the use at issue involved a combination of local anesthetic and epinephrine and that "Stryker warned about the use of epinephrine in its labeling at the time of Plaintiff's surgery," which was "in July, 2005." Additionally, all of the evidence presented by the plaintiff in *Phillippi* post-dates "his surgery and thus does not establish what Stryker knew or should have known at or before the time of Plaintiff's operation." *Id.* at *8. Conversely, Plaintiff claims that in the

instant case, Defendant was on notice before 2005.

12. In an infusion pump case in Colorado state court, the court denied Breg's motion for summary judgment, finding that there was an issue of fact as to what facts existed in the medical literature and community in April 2005 (the date of plaintiff's surgery). In support of this finding, the court cited plaintiff's contention that "as early as 2004, orthopedic surgeons had started seeing cases of chondrolysis, and at least one publication reported such." *Holder v. Breg*, Case No. 09cv7556, July 6, 2010 Order (D.Colo.2010). (Doc. 51, Ex. 12). However, this Court is not persuaded by the one page non-binding decision which lacks any substantive analysis of its reasoning. The decision fails to explain whether Plaintiff's contention was supported by expert testimony, literature, or other evidence. "Conclusory statements are insufficient in summary judgment proceedings." *Shaw v. Danley*, No. 98–6579, 2000 WL 64945, at *7, 2000 U.S.App. LEXIS 545, at *19–20 (6th Cir. Jan. 10, 2000). *See also Brooks v. Am. Broad. Co., Inc.*, 999 F.2d 167, 172 (6th Cir.1993) (noting that in summary judgment analysis, "the district court is not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question.").

Accordingly, while the Court finds the case law presented by both parties to be instructive, neither side presented cases sufficiently similar to the instant case to control this Court as to the pending motion.

### b. Literature

■ Plaintiff points to multiple articles published prior to 2005, which allegedly put Defendant on notice that continuous exposure or repeated injections of solutions, including local anesthetics, into the joint could permanently harm and destroy cartilage. *See supra,* Section III at 9 (list of articles). Plaintiff claims that the fact that both she and Dr. Cawley [13] were able to find these articles, indicates that Defendant could have found the articles had it exercised the care required by a medical device manufacturer. Specifically, Plaintiff alleges that Mark Howard [14] should have cited or reviewed these articles when he put together a 1999 report regarding the potential risks posed by Breg pain pumps.

First and foremost, this Court is particularly troubled by Plaintiff's failure to provide any expert testimony supporting counsel's bald conclusion that there was relevant literature available prior to March 2005. This Court has reviewed the proffered articles and finds that on their face,

they did not put Defendant on notice of a risk of chondrolysis from the continuous infusion of bupivacaine into an intra articular space prior to March 2005. However, the Court is not a medical expert, and while it may rely on a medical expert's interpretation of the literature, the Court is not willing to rely on counsel's interpretation of the literature. *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318, n. 8 (9th Cir.1995) ("the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine").[15] Plaintiff's counsel have not been designated as experts or completed expert reports pursuant to Fed.R.Civ.P. 26. Therefore, their allegations are necessarily limited to legal issues and cannot touch upon an analysis or conclusion regarding the interpretation of medical literature.

In fact, Plaintiff's own experts testified that the first possible association between continuous intra-articular infusion of local anesthetic and postarthroscopic glenohumeral chondrolysis emerged with the publication of Dr. Hansen's article.[16] Dr. Favorito, one of Plaintiff's non-retained expert witnesses in this case, stated that the first time he became aware of postarthroscopic glenohumeral chondrolysis ("PAGCL") was upon reading the Hansen article in October 2007.[17] (Doc. 55 at

---

13. Dr. Cawley was Breg's former Vice President of Research. He testified that his "principal responsibility while at Breg was to remain up to [sic] on all of the current literature, particularly as regards to our business and orthopedic practice, and to provide information relevant—information to product managers, regulatory people et cetera." (Doc. 53 at 9).

14. Mark Howard is the Director of Orthopedic Practice Solutions at Breg.

15. *See also In re Human Tissue Prod. Liab. Litig.,* 582 F.Supp.2d 644, 667 (D.N.J.2008) (excluding testimony of Suzanne Parisian— one of plaintiff's experts—because "the arguments and extrapolations of counsel alone are

not sufficient to prove the reliability of the experts' conclusions").

16. Brent P. Hansen, *et al.,* Postarthroscopic Glenohumeral Chondrolysis, Am. J. Sports Med. 35:10:1628, 1632–33 (2007) (Doc. 51, Ex. 6).

17. Dr. Favorito stated that as of March 2005, there were no publicly available peer-reviewed articles, abstracts, case reports, case series, books, or treatises in which anyone concluded that the intra-articular continuous infusion of anesthetic caused chondrolysis. (Doc. 55 at 111). Plaintiff argues that Dr. Favorito's knowledge is irrelevant because the duty of a medical device manufacturer is not

28). Plaintiff's expert, Dr. Hasan, testified that orthopedic surgeons first became aware of a potential association between the use of a pump to deliver the continuous infusion of local anesthetics and the development of glenohumeral chondrolysis "sometime between October 2007 and [June 2010]." (Doc. 51, Ex. 6). According to Dr. Hasan, prior to October 2007, there were no peer-reviewed articles noting a possible association between the infusion of anesthetic into the shoulder joint and chondrolysis.[18] (*Id.*)

Plaintiff also refers to a "detailed and rigorous investigation of the available science on the problem of chondrolysis" that Dr. Cawley conducted in 2006. (Doc. 52 at 13). While Plaintiff claims that Dr. Cawley "found and cited many articles that existed prior to 1999" (*Id.*), she fails to discuss those articles or how they would have put Defendant on notice of any such risk. If it is assumed that these articles are some of the same discussed herein, this Court has already explained its unwillingness to conclude that the articles should have put Defendant on notice.[19]

The Court's analysis is focused on what Defendant knew or should have known in March 2005. However, even still today, it appears that the cause of chondrolysis has yet to be determined. (Doc. 49 at 6–8). *See, e.g., In re Ambulatory Pain Pump–Chondrolysis Prods. Liab. Litig.,* 709 F.Supp.2d 1375, 1377 n. 3 (M.D.L.2010) ("Although proponents of centralization argue that the scientific data and clinical studies demonstrate that the continuous

infusion of anesthetic into the joint space destroys cartilage, the record indicates that the science is, in fact, not so certain."). *See also Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 671–72 (6th Cir.2010) ("Yet, so long as there is a line, some forms of testimony may cross it, and that happened here. Dr. Carlini's opinion contains not just one speculation but a string of them ... At some point, the train becomes too long to pull and the couplings too weak to hold the cars together.").

Accordingly, the Court finds that the articles cited by Plaintiff, both taken together and separately, are not sufficiently reliable to support her foreseeability argument.

#### c. Internal Emails

■ Plaintiff points to several of Defendant's internal emails from December 2005 and January 2006 to support her argument that Defendant "was aware of chondrolysis following use of pain pumps at least three months before the Beck–Hansen presentation in March 2006." (Doc. 52 at 24). The first email in the series is a December 22, 2005 email from Mr. Cawley to other Breg employees. Attached to the email is a memorandum that Plaintiff alleges indicates that Defendant was considering the possibility of changing pain pump warnings to include chondrolysis. (Doc. 52 at 24).

■ Significantly, the emails are dated approximately nine months after Plaintiff's surgery, which makes them irrelevant to the issue of what Defendant knew or

measured by what an orthopedic surgeon would or would not do, and notice to a manufacturer is not governed by what physicians should or should not have known.

18. Plaintiff's expert, Dr. Dragoo, has similarly testified that no report in the published medical literature existed before 2007 attributing a patient's chondrolysis to the intra-articular infusion of bupivacaine. (Doc. 54 at 169).

19. Additionally, Plaintiff alleges that an October 2003 closed-door meeting of the American Shoulder and Elbow Surgeons should have put Breg on notice. However, as its name implies, the October 2003 meeting was a closed-door meeting that manufacturers such as Defendant could not attend. (Doc. 52, Ex. 26 at 1 (noting "20th Closed Meeting")).

should have known before Plaintiff's surgery. Moreover, the emails do not show that Defendant was aware of a risk of chondrolysis following pain pump use in December 2005. In fact, Dr. Crawley's memorandum shows Defendant's lack of knowledge about a possible association between continuous infusion of local anaesthetics and chondrolysis. (*See* Dec. 22, 2005 Mem. from P. Cawley, Doc. 63, Ex. 24).

> None of these reports indicated that the use of a continuous infusion device was implicated in the development of chondrolysis.
>
> * * * *
>
> At this point, the incidence of chondrolysis associated with the use of continuous intra-articular infusion devices and the use of bupivacaine is nothing more than speculation. However, enough suspicion exists that we should be cautions [sic] and should probably recommend that bupivacaine with epinephrine not be used for this application until further evidence is available.

(*Id.* at 1, 2). However, "knowledge of a mere 'possibility of danger' does not necessarily translate to a legal warning requirement, nor does it necessarily imply liability." *In re Welding Fume Prods. Liab. Litig.*, No. 1:03–cv–17000, 2005 WL 1868046, 2005 U.S. Dist. LEXIS 46164 (N.D.Ohio Aug. 8, 2005).

The memorandum, (even had it been produced before March 2005), is insufficient evidence that Defendant or anyone else knew or had reason to know that continuous infusion of local anesthetics delivered into a joint site might cause chondrolysis.

#### d. FDA Violations

■ The FDA cleared a general indication for use for the pump at issue in this case the Pain Care 4200. (DFA Clearance Letter for the Pain Care 4200, Doc. 51, Ex. 4). The Pain Care 4200 cleared use indication is that "[t]he Pain Care 4200 is indi-

cated to provide continuous infusion of a local anesthetic for the post-operative management of pain." (*Id.*) Defendant argues that the clearance provides practitioners the flexibility to use its pumps in a manner they believe is in the best interests of their patients. (Expert Report of P. Phillips, Doc. 71, Ex. 2 at ¶ 29). The language of the cleared indication-for-use statement is general, and there are no express or implied restrictions on the types of surgical sites as to which the FDA cleared the pump for use. (*Id.* at ¶¶ 26, 29).

Plaintiff claims that Defendant represented its product for a use to which it did not conform when it continued to sell its pain pumps for orthopedic use in 2005, even though the FDA had expressly refused to clear these devices for orthopedic use beginning several years earlier. Plaintiff maintains that, between 1998 and 2004, Defendant's requests to include indications for use for orthopedic and intra-articular uses in 510K applications were denied by the FDA on four separate occasions, and, accordingly, any and all references to these uses needed to be deleted from 510 applications before they could be approved.

Plaintiff alleges that Defendant is liable under Ohio Rev.Code § 2307.73(A)(1) for promoting its pain pumps for intra-articular use after the FDA had forbidden it from that very use. Plaintiff alleges that Defendant misrepresented the FDA clearance of its pain pumps to orthopedic surgeons. The clinical instructions for the 4200 include the following from "Placing the Catheter:"

> Remove the introducer needle from the insertion catheter. Insert the Multiport catheter. Make certain the end with the multiple black markings is inserted into the catheter. Can be

trimmed to any length to accommodate surgical site and/or joint size. (Doc. 52 at 28).

Defendant does not contest the fact that during the course of the FDA's review of some of its 510(k) submissions, an FDA reviewer, nurse consultant Irene Naveau. requested that the word "orthopedic" be removed from the comparative tables.[20] (8/14/00 Letter from I. Naveau, Doc. 52, Ex. 9). The basis for this request was twofold: (1) Defendant did not include the specific word "orthopedic" in its proposed indications for use; and (2) pumps of this nature are usually cleared for general, not specific indications for use. (Doc. 72, Ex. 2 at ¶ 27). Defendant maintains that the FDA's issuance of general, rather than specific, indication-for-use-statements for medical devices is extremely common. (*Id.* at ¶ 50).

Moreover, any disputed issues of material fact regarding the FDA regulations do not affect or preclude summary judgment because they are immaterial to Plaintiffs claims under Ohio law. A manufacturer's "claimed violations of FDA regulations would not be dispositive of the germane issues ... and would not be relevant in helping the jury determine the adequacy of the warning." *Renfro v. Smith Lab., Inc.,* No. S–87–33, 1988 WL 134233, 559 N.E.2d 150 (Ohio App. Dec. 16, 1988), *aff'd* 52 Ohio St.3d 27, 556 N.E.2d 150 (Ohio 1990). *See also Loreto v. Proctor & Gamble Co.* (S.D.Ohio Sept. 3, 2010) ("Plaintiffs seek damages as a result of P & G's alleged failure to seek and obtain FDA approval before selling the Products in interstate commerce. No private right of action exists for such a claim, and insofar as Plaintiffs seek recovery for such alleged violations, those claims are dismissed.").[21] Therefore, this Court need not reach any conclusion on the alleged FDA violations because even if Defendant were not in compliance, FDA regulatory issues do not affect or preclude summary judgment because they are immaterial to Plaintiff's claims under Ohio law.

### e. Testing Failures

▮ Finally, Plaintiff argues that, had Defendant conducted additional or different pre marketing testing, it would have foreseen that intra-articular infusion of anesthetic can cause chondrolysis. (Doc. 52 at 31–34). Defendant "could have started by reviewing the literature and conducting *in-vitro* studies and animal studies, which would have revealed that intra-articular use of pain pumps kills the joint's cartilage." (*Id.* at 32). Plaintiff cites no evidence or authority to establish her suggested standard of care—that Defendant

---

**20.** A request from an FDA reviewer is not an official FDA decision or opinion. (Phillips Report, Doc. 71, Ex. 2 at ¶ 27).

**21.** *See, e.g., Wolicki–Gables v. Arrow Int'l, Inc.,* 641 F.Supp.2d 1270, 1292 (M.D.Fla. 2009) ("The Court recognizes that the FDCA [Food Drug and Cosmetic Act] and its regulations prohibit off-label promotion by manufacturers, but, even if such a claim were present in this case, there is no private right of action for violations of the FDCA."); *In re Neurontin Mktg. and Sale Practices Litig.,* 244 F.R.D. 89, 92 n. 6 (D.Mass.2007) ("While off-label marketing is illegal, there is no private right of action to enforce it."); *Alexander v. Smith & Nephew,* 98 F.Supp.2d 1310, 1321 (N.D.Okla.2000) (acknowledging that the FDCA does not provide a private right of action) (citing 21 U.S.C. § 337(a) (providing that, with limited exceptions, "all ... proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States")); *McCarthy v. Danek Med., Inc.,* 65 F.Supp.2d 410, 414 (E.D.La.1999) ("There is no private right of action under the FDCA."); *In re Epogen & Aranesp Off–Label Mktg. & Sales Prac. Litig.,* 590 F.Supp.2d 1282, 1288–89 (CD.Cal.2008) (dismissing a complaint that was "rife with similar references to illegal off-label promotion" and holding that "allegations of off-label promotion are, in essence, misbranding claims that should be reviewed by the FDA").

should have reviewed literature and conducted *in-vitro* studies—or that Defendant breached a duty to test.

Under the OPLA, Defendant was required to issue "the warning or instruction that a manufacturer exercising reasonable care would have provided" as to risks related to its products of which it "knew or, in the exercise of reasonable care, should have known." Ohio Rev.Code § 2307.76(A)(1). Manufacturers have a continuing duty to warn where the manufacturer has knowledge of the risk. Ohio Rev.Code § 2307.76(A)(2).

Defendant maintains that even after its review of the relevant literature, its discussions with physicians, and its preliminary testing, Defendant "had no index of suspicion" that chondrolysis could be an issue. (Doc. 71, Ex. 15 at 65). Mark Howard, Director of Orthopedic Practice Solutions at Breg, explained that:

> The primary feedback that we got from the physicians of what they were concerned about using these devices was infection and the toxicity of the medication systemically, cardiotoxicity and respiratory. And we did—we wanted to make sure that the sterile fluid path was never violated. And that when we did our [FMEA], which is a process we looked for failure of the device, ... included all kinds of in-line testing. We did pre-production testing. We did drop testing. We did shake, rattle and roll testing, we tested this device to death because safety is paramount at Breg. It is vital.

(*Id.* at 65–66).

> [I]n my opinion the people working inside Breg, the research department inside Breg, the development engineers went out and looked at all the signals they had available to them in general for the functionality of this device and its intended use.... In other words, they went out and they looked at the literature, talked to customers, looked at what other companies were doing, kept track of all the information that they had, ... and they went at it and identified a lot of things that could have potentially been hazards and evaluated the risk of those potential hazards, and they did it in a fashion that was organized using a failure modes and effects analysis process....
>
> * * * * *
>
> There's nothing out there that ... would have caused Breg to stop and say, "This is an identified hazard. There's a potential risk associated with it. Let's go do some testing to assess the risk and abate it." There was no evidence for that. My point is in my opinion the reason that no experiment of the sort that you described was carried out is because nobody had identified a risk that needed to be hypothesized, an experiment designed and executed when these devices were being designed. There was just no information, and not for lack of asking.
>
> * * * * *
>
> In other words, it's the old "Well, you should have known," and what the record indicates to me that Breg did is they went out and they looked proactively, they engaged the medical, the scientific community, and they were looking—consistently looking for signals. You can't create signals that aren't there.

(Doc. 71, Ex. 14 at 118–20, 127).

The thrust of Plaintiff's inadequate testing argument is that Defendant's pain pumps were not cleared for orthopedic applications and, therefore, they "became a class III device with respect to the orthopedic applications." (Doc. 52 at 17). This, Plaintiff argues, required Defendant to seek approval under the FDA's Premarket Approval Process, rather than through the substantial-equivalent pathway to market

clearance.[22] The PMA process would have involved "extensive testing to establish both efficacy and safety of the device for the indications sought." (*Id.*) This testing, according to Plaintiff, would have required "animal and/or *in vitro* toxicity tests." (*Id.; see id.* at 17–18).

First, as an evidentiary matter, Plaintiff cites no facts or authority of any kind to support her position. Her opposition fails to point the Court to a single piece of evidence in the record that would establish: (1) that the pain pumps were not cleared for orthopedic "applications;" (2) that the pain pumps became Class III devices in any manner or respect; or (3) that Defendant was required to engage in the PMA Process. The undisputed facts make clear that Breg's Pain Care 4200 was cleared for marketing for general use based on the FDA's determination there existed a substantially equivalent predicate device. (FDA clearance letter (April 4, 2002) at 1–3, Doc. 71, Ex. 4). Second, as a factual matter, Plaintiff is simply wrong when she claims that Defendant's pain pumps were Class III devices. They were not, and this fact is undisputed in the record before the Court. (*See, e.g.,* FDA clearance letter (April 4, 2002) at 1–3, Doc. 51, Ex. 4; Doc. 71, Ex. 2 at ¶ 14).

Defendant has presented evidence that it engaged in thorough testing of its pain pumps before taking them to market. (Doc. 71, Ex. 14 at 118–20, 127). Plaintiff's criticism of Defendant's testing is that Defendant did not specifically structure a test that would have revealed whether infusion of anesthetic in the joint can cause postarthroscopic glenohumeral chondrolysis. However, given the risk profile of pain pumps, and the history regarding the intra-operative injection of anesthetic in orthopedic procedures, there was simply no reason for Defendant to have developed specific testing protocols to uncover the supposed link between pain-pump use and postarthroscopic glenohumeral chondrolysis. Dr. Ochoa explained this point at his deposition when asked if anything prevented Defendant from conducting tests to determine "whether particular medical devices are capable, in general, of damaging cartilage":

> Actually, there is, and it's an obvious thing, maybe too obvious, and it requires a little bit of experience in the field of biomedical engineering research and new product development, but it's the most obvious thing that would have prevented Breg from doing the work, which is there was no reason to do it. There was no indication that that particular experiment, type of experiment should have been carried out.

(*Id.* at 117). *See, e.g., Miles v. Kohli & Kaliher Assocs., Ltd.,* 917 F.2d 235, 247 (6th Cir.1990) ("Because Ohio law treats the duty to instruct or warn under a negligence standard, the obligation extends only to those risks of which the defendant is aware or, in the exercise of reasonable care, ought to be aware." (citing *Hargis v. Doe,* 3 Ohio App.3d 36, 443 N.E.2d 1008, 1010 (Ohio App.1981))).

---

**22.** Premarket approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, FDA has determined that general and special controls alone are insufficient to assure the safety and effectiveness of class III devices. Therefore, these devices require a PMA application to obtain marketing clearance. *See* http://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarket submissions/premarketapprovalpma/default.htm

Additionally, Plaintiff accuses Defendant of testing without FDA permission. (Doc. 52 at 17–18, 41). Plaintiff claims that Defendant performed field testing without obtaining an Investigational Device Exemption ("IDE").

The IDE regulation applies to clinical investigations of devices to determine safety and effectiveness, except as explicitly exempted under 21 C.F.R. § 812.2(c). There are seven categories of device investigations that are not subject to the requirements of the IDE regulation. One of these exemptions is for clinical studies of a device that FDA has found substantially equivalent ("SE") and that is used or studied in accordance with the indications for use accepted by the SE determination. *See* 21 C.F.R. § 812.2(c)(2). In the case of Defendant's alleged "illegal" field trials (Doc. 52 at 41), the studies were initiated after receipt of FDA's SE determinations (*i.e.,* its determinations that Defendant's pain pumps were substantially equivalent to a previously cleared device) and involved use of devices pursuant to their cleared indications for use. (Doc. 71, Ex. 2 at ¶¶ 40–41). Thus, there is nothing "illegal" about Defendant's field trials. Indeed, had the FDA determined that Defendant's field trials violated IDE regulations and did not fall within an IDE exemption, the FDA could have initiated action to enforce the regulations. That has never been done or even suggested.

Defendant's field trials constituted design-validation studies consistent with quality systems requirements. (Doc. 71, Ex. 2 at ¶ 42). In accordance with 21 C.F.R. § 820.30(g), design validation:

> shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validation shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

Defendant's field trials were intended to validate each device's design by evaluating factors including effectiveness of pain control, ease of use, product reliability, and manufacturing process. (Doc. 71, Ex. 2 at ¶ 42; Ex. 15 at 76 ("The primary purpose of a field trial is to make sure that the device is functioning as intended, that it works mechanically correct, it doesn't leak. And also at the same time looking at how it worked for patients, and also documenting if there's any adverse events or complications.")). Moreover, no complaint of chondrolysis-related injuries has ever been reported in connection with Defendant's field trials. (Doc. 71, Ex. 2 at ¶ 42; Ex. 15 at 77–78 (noting that the field test results reported no complications)).

While undoubtedly the line between having and not having a duty to warn of a particular risk often is hard to draw, in this case the evidence of record makes it clear that wherever the line was, it had not been reached by the time of Plaintiff's surgery in March 2005. As of the time of Plaintiffs surgery, the now-purported association between chondrolysis and anesthetic infusion in the shoulder joint was unknown to Defendant, and, indeed, to the entire medical scientific community. Therefore, Defendant breached no duty, and the Pain Care 4200 pump was not defective for inadequate warnings or instructions.

## B. Design Defects

Plaintiff's complaint includes a design-defect claim. (Doc. 1 at ¶¶ 42–48). Her theory is that the Pain Care 4200 is defectively designed because it was "more dangerous than a reasonable prudent consumer would expect when used in an intended or reasonably foreseeable manner." (*Id.* at ¶ 45). Additionally, Plaintiff alleges

that the warnings or lack thereof that accompanies a product are a part of the product's design. *Graham v. Am. Cyanamid Co.*, No. C–2–94–423, 2000 WL 1911431, at \*10, fn. 11, 2000 U.S. Dist. LEXIS 22739, at \*36, fn. 11 (S.D.Ohio 2000) (citing *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149–50 (6th Cir.1996)).

■ Pursuant to Ohio Rev.Code § 2307.75, "a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation … exceeded the benefits associated with that design or formulation[.]" To prevail on a design defect claim, a plaintiff must show that the design risks outweigh the benefits. *Patterson v. Central Mills, Inc.*, 112 F.Supp.2d 681, 687 (N.D.Ohio 2000) (citing *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507, 700 N.E.2d 1247 (Ohio 1998)).

■ Plaintiff's design-defect claims fail for the same reason Plaintiff cannot prove her warnings claims—there is no evidence that Defendant knew or had reason to know of a purported risk associated with intra-articular infusion of anesthetics.

## VI. CONCLUSION

The Court has carefully examined the evidence and determined that it is insufficient to establish a genuine factual dispute that, at the time of Plaintiff's surgery, Defendant had a duty to warn physicians regarding the risk of cartilage damage from using a pain pump to administer anaesthetic. In the absence of such a duty, Defendant cannot be held liable for Plaintiff's injury. Here, there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Accordingly, Defendant is entitled to entry of summary judgment in its favor on its motion as a matter of law.

**IT IS SO ORDERED.**